UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Christopher Manson, Monique Cipro, and Bennett Reed, <br><br> Plaintiffs, <br><br> v. <br><br> Fresno Housing Authority and Parc Grove Commons III, L.P., <br><br> Defendants. | No. 1:23-cv-00679-KES-SKO <br><br> ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT <br><br> Doc. 27 |

Plaintiffs Christopher Manson, Monique Cipro, and Bennett Reed bring this action against defendants Fresno Housing Authority and Parc Grove Commons III, L.P., alleging violations of the Fair Housing Act, 42 U.S.C. § 3601 et seq. ("FHA"); Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"); the Fair Employment & Housing Act, Cal. Gov't Code § 12900 *et seq.* ("FEHA"); Cal. Gov't Code § 11135; the Unruh Civil Rights Act, Cal. Civ. Code § 51 *et seq.* ("Unruh Act"); and the California Disabled Persons Act, Cal. Civ. Code § 54 *et seq.* ("DPA"). Doc. 1 ("Compl."). Plaintiffs also bring a negligence claim against defendants. *Id.*

Plaintiffs move for summary judgment on all their claims except negligence. Doc. 27 ("MSJ"). Plaintiffs filed a separate statement of undisputed facts, Doc. 28, two declarations with exhibits, Docs. 29-30, and two amendments to those declarations, Docs. 44-45, in support of their

1  motion. Defendants filed an opposition to the motion, attaching a declaration and exhibits. Doc.
2  36 ("Opp'n"). Defendants filed two notices of errata correcting errors to their filed exhibits.
3  Docs. 37, 46. Plaintiffs replied to the opposition, Doc. 39, filing a declaration in support of the
4  reply, Doc. 40. Defendants filed evidentiary objections to the evidence plaintiffs present in
5  support of the motion for summary judgment, Doc. 38, to which plaintiffs responded, Doc. 42.
6  Plaintiffs also filed evidentiary objections to the evidence defendants presented in opposition to
7  the motion for summary judgment. Doc. 41.
8   The Court held oral argument on this matter on February 10, 2025, and took the matter
9  under submission. Doc. 47. For the reasons stated below, plaintiffs' motion for summary
10 judgment is denied.

11 **I.    FACTS[1]**

12  Plaintiffs Manson and Cipro resided at the Renaissance at Parc Grove ("Renaissance")
13 from May 2021 until early- to mid-2023. Doc. 41, Pls.' Resp. to Defs.' Separate Statement of
14 Undisputed Facts ("DSUF") ¶ 7. Plaintiff Reed still resides at the Renaissance. DSUF ¶ 8. The
15 Renaissance was constructed for first occupancy in 2017 and is a supportive housing project and
16 complex of affordable housing units for homeless and disabled veterans. DSUF ¶¶ 1, 3. The
17 Renaissance is a two-story building with one elevator. DSUF ¶ 2. The property is owned by
18 defendant Parc Grove Commons III, LP, and is managed by defendant Fresno Housing Authority.
19 DSUF ¶ 5. The property is funded by both state and federal programs. DSUF ¶ 4. Thus,
20 defendants are housing providers subject to the FHA, section 504, FEHA, Cal. Gov't Code
21 § 11135, the Unruh Act, and the DPA. DSUF ¶ 6.
22  Manson and Cipro lived together at the Renaissance in an apartment on the second floor.
23 *See* Doc. 46-1, Ex. 15A at 100:18-102:17; Doc. 36-5, Ex. 15B; Doc. 36-5, Ex. 15C. Reed lives
24 in an apartment on the first floor but often travels to the second floor to visit friends. Doc. 36-1,
25 Defs.' Resp. to Pls.' Separate Statement of Facts ("PSUF") ¶ 35. Plaintiffs Manson and Reed

---

[1] The following facts are based on the evidence as viewed in the light most favorable to defendants as the non-moving parties. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (holding that on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor.").

have mobility disabilities and each use wheelchairs to ambulate. PSUF ¶¶ 11, 15. Plaintiff Cipro states that multiple doctors have diagnosed her with a disability, that a judge determined she had a disability in a social security proceeding, and that she sometimes uses a cane to walk. Doc. 30-29 at 21:4-25; 98:23-99:1. Cipro receives supplemental social security income due to her disability and provided proof of that income to defendant Fresno Housing Authority. *See* Docs. 30-3, 40-1 at Exs. 2-5. However, on the application she filled out to live at the Renaissance, Cipro checked a box to indicate that she does not have a disability. Doc. 37-2 at 5. Additionally, Reginald Colbert, the property manager, testified that, when Cipro resided at the Renaissance, she often walked her dog and took the stairs, and only took the elevator when she was with Manson. Doc 46-1 at 112:13-20.

The elevator at the Renaissance had at least 87 outages between 2021 and early- to mid-2023, at least 68 of which resulted in temporary entrapment of a passenger.[2] DSUF ¶¶ 15-17. Plaintiffs' expert, Steve Green, a "Q.E.I. Certified Elevator Inspector," opined that the elevator should have no more than 3-5 trouble calls and one entrapment per year.[3] Doc. 29 ("Green Decl.") ¶¶ 1, 15. Plaintiffs testified that the frequent elevator outages and entrapments caused plaintiffs to be trapped inside or outside of their apartments, to miss appointments and gatherings, and to avoid the elevator altogether. Doc. 30-29 at 69:25-70:6; Doc. 30-30 at 66:25-67:25; Doc. 30-31 at 71:21-72:11.

Defendants did not have a written evacuation procedure in case of emergencies or a written procedure detailing safety precautions when evacuating entrapped passengers from the elevator.[4] When an outage or an entrapment would occur, Colbert would reset the elevator by turning its power off and turning it back on. Doc. 30-28 at 89:19-90:16. This process reset the

---

[2] Plaintiffs claim that the number of elevator outages and entrapments is higher. *See* MSJ 9.

[3] Defendants did not put forth expert testimony. *See* Doc. 34 (parties' joint stipulation that defendants withdrew their expert designation and will not use any expert testimony in this litigation).

[4] Defendants confirmed this fact at the motion hearing. However, as discussed below, plaintiffs do not provide any evidence that ties the lack of a written procedure to their claims. *See infra* Section IV.C.i.

elevator's computer. Green Decl. ¶ 9. If an entrapped person sounded the emergency alarm, defendants' elevator vendor, Schindler Elevator Corp. ("Schindler"), was notified, and Schindler would call Colbert to let him know that they were sending out a technician. Green Decl., Doc. 29-3, Ex. C, at 91:12-16; 136:3-19. Typically, the technician would then call Colbert to "gauge who was closer" to determine which of the two—the technician or Colbert—would release the elevator. Green Decl., Doc. 29-3, Ex. C, at 136:3-19. If resetting the switch did not work, sometimes the fire department would be called. *Id.* at 12:16-24.

Green opined that defendants should have scheduled preventative maintenance at least monthly and that Schindler performed preventative maintenance on only 6 occasions in 2019, 10 in 2020, 5 in 2021, 8 in 2022 and 5 in 2023. Green Decl. ¶ 7; Green Decl., Doc. 44, Ex. B at 43-155; *see also* Doc. 30 ¶ 28; Doc. 45. However, defendants' contracts with Schindler anticipated that Schindler would perform preventative maintenance on the elevator (Green Decl., Doc. 44, Ex. B at 2-16; Doc. 36-3 at 27-28; Doc. 76) and defendants' records contain numerous "preventative maintenance" work reports on the elevator, bearing separate dates: 7 such work reports in 2019, 10 in 2020, 10 in 2021, 13 in 2022, and 9 in 2023. Doc. 36-5 at 36-148; Green Decl., Doc. 44, Ex. B at 43-155. Moreover, the Renaissance paid for monthly preventative maintenance and Colbert testified that Schindler performed preventative maintenance monthly. Doc. 46-1, Ex. 17, at 82:9-16.

Colbert frequently called Schindler, speaking with both technicians and the manager, and asked what more could be done to permanently fix the elevator. Doc. 46-1 at 143:1-144:4. Schindler told him that the issues with the elevator were caused by "transients" coming into the elevator and "smoking" or "doing something" which was causing the elevator to malfunction. *Id.* Defendants contacted an outside electrician once to look at the elevator at Schindler's suggestion. Doc. 30-28 106:7-25. Defendants also contacted an alternate vendor to assist with an entrapment once when Schindler did not arrive quickly enough, and the fire department could not open the elevator. Doc. 46-1, Ex. 22, at 82:20-83:20. Defendants did not otherwise attempt to hire another vendor to service the elevator. Doc. 139:19-141:13. Schindler finally resolved the issue and fixed the elevator in March 2023. DSUF ¶ 54; PSUF ¶ 74.

1    Though plaintiffs claim that defendants did not document entrapments that occurred
2    during working hours, Colbert testified that he did not "know of anyone being stuck in the
3    elevator during the daytime," and that if an entrapment had occurred during business hours, he
4    would have created an incident report. Doc. 46-1, Ex. 10, at 148:5-20. Colbert explained that all
5    entrapments were logged, either by the fire department, Schindler invoices, or on Colbert's
6    timecard.[5] *Id.* at 148:22-149:1.

7    Separately, in August 2022, defendants installed an enclosed dog park at the Renaissance.
8    PSUF ¶ 75. The path to the dog park is constructed of partially compacted sand and grass. PSUF
9    ¶ 76. Plaintiffs claim the path to the dog park gets muddy when it rains, which renders the dog
10   park inaccessible to plaintiffs. MSJ 29; PSUF ¶ 77. Colbert denied that the path got muddy when
11   it rained and testified that, rather, the sand became more densely packed and harder. Doc. 46-1 at
12   62:16-63:1. The dog park is currently closed. Doc. 40-1, Ex. 6 at 66:25-67:24.

## II.   LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021) (internal quotations omitted) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 841. The parties must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). The Court then views the record in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Id.* at 587 (citations omitted).

"A party seeking summary judgment bears the initial burden of informing the court of the

---

[5] When Colbert responded to elevator entrapments outside of working hours, he listed the entrapment on his timecard as the justification for clocking in after hours. *See* Doc. 30-28 at 122:5-8. Thus, his timecards contained records of those entrapments. *Id.*; *see also* Doc. 46-1, Ex. 10, at 148:5-13.

5

1  basis for its motion and of identifying those portions of the pleadings and discovery responses
2  that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless,*
3  *Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323
4  (1986)).  If the moving party meets its initial burden, the burden shifts to the nonmoving party to
5  produce evidence supporting its claims or defenses and "establish that there is a genuine issue of
6  material fact." *Matsushita*, 475 U.S. at 585.  The nonmoving party "must do more than simply
7  show that there is some metaphysical doubt as to the material facts." *Id.* at 586 (citation omitted).
8  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position" is
9  insufficient to survive summary judgment. *Anderson*, 477 U.S. at 252.

10       In the endeavor to establish the existence of a factual dispute, the opposing party need not
11  establish a material issue of fact conclusively in its favor. *T.W. Elec. Serv., Inc. v. Pac. Elec.*
12  *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  It is sufficient that "the claimed factual
13  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at
14  trial." *Anderson*, 477 U.S. at 252 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S.
15  253, 289 (1968)).

16       "If the nonmoving party fails to produce enough evidence to create a genuine issue of
17  material fact, the moving party wins the motion for summary judgment.  But if the nonmoving
18  party produces enough evidence to create a genuine issue of material fact, the nonmoving party
19  defeats the motion." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099,
20  1103 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

21  **III.  EVIDENTIARY OBJECTIONS**

22       Both parties raise objections to the evidence cited in support of and in opposition to the
23  motion for summary judgment. *See generally* Docs. 38, 41.  The objections are "garden variety
24  evidentiary objections" such as relevancy, hearsay, foundation, and speculation. *See Torres v.*
25  *Los Angeles Sheriff's Dept.*, Case No. CV 22-07450-MWF (MARx), 2024 WL 4720808, at *5
26  (C.D. Cal. Aug. 14, 2024).

27       "[A]t the summary judgment stage, we do not focus on the admissibility of the evidence's
28  form.  We instead focus on the admissibility of its contents." *Sandoval v. Cnty. of San Diego*, 985

F.3d 657, 666 (9th Cir. 2021). That is, though such objections could prove cognizable at trial, only the admissibility of the relevant facts at trial, not the form of these facts as presented in the motion, matters for purposes of a motion for summary judgment. *See id.* Where "the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment." *Id.* (citations omitted).

To the extent that the Court relies upon evidence to which a party objects in deciding the motion for summary judgment, the objections are overruled. To the extent the Court does not, the objections are denied as moot.

**IV.   ANALYSIS**

    **A. Plaintiffs' Reasonable Accommodation Claim Under the FHA, FEHA, the DPA, and the Unruh Act**

Plaintiffs move for summary judgment on their claim that defendants failed to reasonably accommodate their mobility disabilities by failing to timely and sufficiently repair the Renaissance's elevator, in violation of the FHA, FEHA, the DPA, and the Unruh Act. The FHA and FEHA have similar statutory language prohibiting discrimination in housing. The FHA's definition of prohibited discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). FEHA's language is nearly identical. Cal. Gov't Code § 12927(c)(1) (West 2020).

Under the FHA and FEHA, plaintiffs must establish that (1) they have disabilities as defined by the relevant statute (that is, the FHA or FEHA); (2) defendants knew or reasonably should have known of their disabilities; (3) accommodation may be (or is) necessary to afford them an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation. *See, e.g.*, *Giebeler v. M & B Associates*, 343 F.3d 1143 (9th Cir. 2003) (outlining elements in FHA claim); *Auburn Woods I Homeowners Ass'n v. Fair Employment & Housing Committee*, 121 Cal. App. 4th 1578 (Cal. Ct. App. 2004) (outlining elements in FEHA

claim).

Defendants argue that there is a genuine dispute of material fact precluding summary judgment as to whether plaintiff Cipro has a disability.[6] Cipro testified in her deposition that she has nerve damage and ruptured discs in her lower back and that she uses a cane when her "back . . . is not good." Doc. 30-29 at 21:4-7, 98:23-99:1. She further testified that she was diagnosed with a disability by multiple doctors and that she was determined to have a disability by a judge in a social security proceeding. Doc. 30-29 at 21:12-25. Cipro also points out that she had provided defendant with documents indicating that she was receiving social security income due to her disability. Reply 7 (citing Doc. 30-3; Doc. 40-1, Exs. 2-5).

In support of their assertion that whether Cipro has a disability is a disputed fact, defendants point to an application and verification of homelessness that Cipro filled out and submitted to apply to live at the Renaissance, in which she checked a box indicating that she did not have a disability. Doc. 37-2 at 5. They also point to property manager Reginald Colbert's testimony that Cipro often walked her dog and took the stairs, and that she took the elevator only when she was with Manson in his wheelchair. Doc 46-1 at 112:13-20.

Regardless of whether there is a dispute of fact that Cipro is disabled as defined by the FHA and FEHA, defendants have shown that there is a genuine dispute of fact as to whether defendants knew, or should have known, about Cipro's mobility disability.[7] While defendants were in possession of income documentation indicating that plaintiff Cipro received SSI benefits due to a disability, the specific nature of her disability was not necessarily apparent from the documents. Moreover, Cipro indicated in her application to live at the Renaissance that she was

---

[6] Defendants do not dispute that plaintiffs Manson and Reed have disabilities.

[7] There may not be a genuine dispute of material fact regarding whether plaintiff Cipro has a disability as defined by the statutes, given that she receives social security income benefits. *See Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 338 (E.D.N.Y. May 23, 2012) ("As a general matter, in most cases, individuals who meet the definition of disability for purposes of receiving SSI or SSDI benefits also qualify as disabled under the federal disability statutes."). However, there is a genuine dispute as to whether defendants were aware of Cipro's disability or the nature of that disability.

8

not disabled, and the property manager testified that she frequently walked her dog and used the stairs and that she used the elevator only when with Manson.  A jury could credit the evidence that defendants put forth and find that defendants did not know, nor should have known, of Cipro's mobility disability.  Defendants have carried their burden of demonstrating that a genuine dispute of fact exists as to whether defendants knew or should have known that Cipro suffered a mobility disability, and the motion for summary judgment as to this claim under the FHA and FEHA is denied.[8]

Plaintiffs do not assert that defendants *actually denied* their request for a reasonable accommodation that defendants repair the elevator, but rather that defendants *constructively denied* their request for a reasonable accommodation by unreasonably delaying in providing a functioning elevator.  MSJ 18-19; Reply 9-11.  Defendants dispute that they refused to make any requested reasonable accommodation regarding the functionality of the elevator.  Opp'n 15-17.  "[A]lthough the Ninth Circuit has not spoken on [the issue of an unreasonable delay constituting a constructive denial], district courts in this circuit have held that a plaintiff may show that the defendant constructively denied a request for accommodation by causing an unreasonable delay or bad faith delay in granting the request."  *Hume v. Guardian Mgmt. LLC*, Case No. 3:21-cv-517-SI, 2022 WL 17834397, at *4 (D. Or. Dec. 21, 2022).  "The determination of whether a request was constructively denied is fact-specific, and made on a case-by-case basis."  *Elliott*, 2018 WL 2933467, at *10.

Plaintiffs argue that twenty-one months passed between when defendants learned that the elevator broke down, for the first time, in June 2021, trapping Manson outside for hours, to when the elevator was fixed in March 2023, and that no reasonable jury could find almost two years to be a reasonable delay for granting a reasonable accommodation request.  MSJ 29; Doc. 30-29 at 30:16-25, 34:7-35:1, 36:23-37:12; Doc. 30-30 at 62:2-12.  Plaintiffs assert that this delay was not reasonable because defendants called Schindler only when there was a "cluster of entrapments"

---

[8] As addressed below, given that Cipro is not entitled to summary judgment on her reasonable accommodation claim under the FHA and FEHA, she is also not entitled to summary judgment as to this claim under the DPA or the Unruh Act.

and did not require Schindler to provide a permanent solution to the problem. MSJ 12; Doc. 30-28 at 139:19-140:19.

Plaintiffs further argue that the delay was not reasonable because defendants did not contact an outside electrician, Doc. 30-28 at 106:7-25, or attempt to retain an alternative elevator vendor when Schindler failed to correct the problem, Doc. 30-28 at 140:18-141:13. Specifically, plaintiffs' expert, Green, opined that the significant number of outages and entrapments could have been avoided had defendants hired a different elevator maintenance contractor or hired Thyssenkrupp, the company that designed, manufactured, and installed the elevator. Green Decl. ¶¶ 19, 20. Green also opined that an elevator like the one at the Renaissance should have no more than 3-5 trouble calls and one entrapment in one year. Green Decl. ¶ 15. Green opined that the 88 entrapments he tabulated between July 2021 and March 2023 was "extreme" and "far exceed[ed] the industry standard." *Id.*

However, the testimony on which plaintiffs rely for the assertion that defendants only called Schindler when there was a cluster of entrapments does not fully support it. Rather, Colbert testified that he would call Schindler when there was "an entrapment *or* a cluster of entrapments," and that when there was a cluster of entrapments, he would ask Schindler to perform additional maintenance. Doc. 30-28 at 139:19-140:19 (emphasis added).Additionally, Colbert testified that he spoke to technicians and the manager at Schindler on a regular basis and asked them for a permanent solution to the problem, but Schindler indicated that nothing more could be done. Doc. 46-1 at 143:1-144:4. Specifically, he testified that Schindler told him that the elevator issues had to do with "transients" coming into the elevator and "smoking" or "doing something," causing the elevator to malfunction. *Id.* Colbert indicated that, based on his conversations with Schindler, he did not think that something was wrong with the elevator itself but rather "chalked [the malfunctions] up to that issue." *Id.* Moreover, given Colbert's testimony regarding defendants' efforts and communications with Schindler, a jury could conclude that not contacting an outside electrician or alternate elevator vendor was reasonable under the circumstances, and thus, could find the delay in the elevator being fixed to be reasonable. Thus, defendants have demonstrated a genuine dispute of material fact as to this issue, and summary

judgment as to this element is not warranted. Summary judgment as to plaintiffs' claims under the FHA and FEHA for a failure to accommodate is therefore denied as to all plaintiffs.

The DPA provides that "[a] person renting, leasing, or otherwise providing real property for compensation shall not refuse to make reasonable accommodations in rules, policies, practices, or services, when those accommodations may be necessary to afford individuals with a disability equal opportunity to use and enjoy the premises." Cal. Civ. Code § 54.1(b)(3)(B) (West 2017). Other courts in this circuit have found that the DPA language closely parallels that of the FHA and FEHA, and therefore, held that the same four elements required for claims under the FHA and FEHA can establish a refusal to provide reasonable accommodation claim under the DPA. *See, e.g.*, *Gutierrez v. Gonzalez*, Case No. 2:17–cv–01906–CAS(Ex), 2017 WL 1520419, at *5 (C.D. Cal. Apr. 26, 2017). Given plaintiffs have not established they are entitled to summary judgment on their reasonable accommodation claim under the FHA and FEHA, they are also not entitled to summary judgment as to this claim under DPA. *See McClendon v. Bresler*, Case No. 2:20-cv-07758-RGK-GJS, 2021 WL 3017511, at *5 n.4 (denying summary judgment as to DPA claim given denial of summary judgment as to FEHA claim).

To prevail on a claim for disability discrimination under the Unruh Act, plaintiffs must establish the following: "(1) [they] w[ere] denied the full and equal accommodations, advantages, facilities, privileges, or services in a business establishment; (2) [their] disability[ies] w[ere] a motivating factor for this denial; (3) defendants denied plaintiff[s] the full and equal accommodations, advantages, facilities, privileges, or services; and (4) defendants wrongful conduct caused plaintiff[s] to suffer injury, damage, loss or harm." *Hunter v. Chatman*, Case No. CV 18-5760-MWF (AGRx), 2018 WL 10076846, at *6 (C.D. Cal. Nov. 20, 2018). Plaintiffs must also "prove intentional discrimination or willful, affirmative misconduct on the part of those who violate the Unruh Act." *Id.* (citing *Greater Los Angeles Agency on Deafness, Inc. (GLAAD) v. Cable News Network, Inc.*, 742 F.3d 414, 425 (9th Cir. 2014)) (cleaned up). Given that plaintiffs have not established that they are entitled to summary judgment regarding whether defendants denied them a reasonable accommodation, as discussed above, they are also not entitled to summary judgment on whether any such denial constituted intentional discrimination

11

or willful, affirmative misconduct under the Unruh Act.

### B. Plaintiffs' Claims under Section 504 of the Rehabilitation Act and Section 11135 of the California Government Code

Section 504 of the Rehabilitation Act of 1973, as amended by 29 U.S.C. § 794, provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. Similarly, section 11135 of the California Government Code provides that "[n]o person in the State of California shall, on the basis of . . . disability . . . be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state." Cal. Gov't Code § 11135(a) (West 2017).

"[Section] 11135 is identical to the Rehabilitation Act except the entity must receive State financial assistance rather than Federal financial assistance." *See D.K. ex rel. G.M. v. Solano County Office of Educ.,* 667 F. Supp. 2d 1184, 1190-91 (E.D. Cal. Oct. 5, 2009). Thus, "[i]f a public entity that receives state funding has violated [section 504 of the Rehabilitation Act], then it has also violated [section] 11135." *Bassilios v. City of Torrance*, 166 F. Supp. 3d 1061, 1084 (C.D. Cal. 2015) (citations omitted).

"A plaintiff bringing a section 504 claim . . . must show that (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." *See, e.g.*, *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 650 (9th Cir. 2021) (citing *Updike v. Multnomah County*, 870 F.3d 939, 949 (9th Cir. 2017) (internal quotations omitted). *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001). When a plaintiff seeks damages, "[the] plaintiff[] must [also] prove a mens rea of intentional discrimination, to prevail on a § 504 claim, but that standard may be met by showing deliberate indifference, and not only by showing discriminatory animus." *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (2008)

(citations and quotations omitted).  Here, plaintiffs seek damages, so this additional requirement applies.[9]

While the parties agree that several of the elements regarding this claim are not in dispute, for the reasons noted above, plaintiffs have not carried their burden as to the third element, and for at least this reason, summary judgment as to their section 504 claim is not warranted. Specifically, there is a material dispute of fact regarding whether defendants denied plaintiffs the benefits of housing at the Renaissance.

"A plaintiff may satisfy prong [three] by showing that the federally funded program denied [him or her] services that [he or she] needed to enjoy meaningful access to the benefits of [the program] and that were available as reasonable accommodations" or "by showing that the program denied [him or her] meaningful access through another means, such as by violating a regulation that implements section 504's prohibitions." *A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1204 (9th Cir. 2016).  Plaintiffs confirmed at the motion hearing that they do not contend that defendants denied plaintiffs access "through another means, such as by violating a regulation that implements section 504's prohibitions." *Id.*  Thus, the question is whether defendants denied plaintiffs services that they needed to enjoy meaningful access to the Renaissance that were available as reasonable accommodations.  As noted above, it is a question for the jury whether defendants unreasonably delayed in providing a fixed elevator and thereby constructively denied plaintiffs a reasonable accommodation.

Thus, summary judgment as to plaintiffs' Section 504 claim and plaintiffs' Cal. Gov't Code section 11135 claim is denied.

**C. Plaintiffs' Claims that Defendants' Failed to Comply with Structural Access**

---

[9] Plaintiffs acknowledge this additional requirement in a single sentence in a footnote in their motion but assert they need not prove intentional discrimination at this time for this Court to grant them summary judgment on their Section 504 claim, presumably indicating that they will attempt to prove such intent when proving damages. MSJ 33 n.3.  Defendants did not respond to this assertion in their opposition.  It seems dubious that the Court could grant summary judgment on plaintiffs' section 504 claim without proof of intentional discrimination. *See, e.g.*, *Mark H.*, 513 F.3d at 938.  However, as described herein, plaintiffs' motion for summary judgment on this claim is denied for other reasons, and the Court need not address this issue.

**Standards, in violation of the DPA and the Unruh Act in Maintaining the Elevator and Constructing the Dog Park**

Plaintiff may also prevail under the DPA or the Unruh Act by proving that the defendants violated an independent California accessibility requirement. *See, e.g.*, *Rodriguez v. Barrita, Inc.*, 10 F. Supp. 3d 1062, 1074 (N.D. Cal. Jan. 3, 2014); *see also Coronado v. Cobblestone Vill. Comm. Rentals*, L.P., 163 Cal. App. 4th 831, 851 (Cal. Ct. App. 2008). Title 24 of the California Code of Regulations (the "California Building Code") sets forth accessibility requirements for public accommodations.[10] *Rodriguez*, 10 F. Supp. 3d at 1074. Thus, "[a] violation of Title 24 standards constitutes a violation of both the Unruh Act and the [DPA]." *Id.* (citation omitted). However, "any such violation [must be related] to the [barrier] that limited plaintiffs' access to or from their apartments." *See Moore*, 2019 WL 5697934, at *12 (denying summary judgment on DPA claim in part because jury could find that violation of accessibility standard was unrelated to elevator outage that limited plaintiffs' access to their apartment). Additionally, as noted, to prevail on a claim for damages under the Unruh Act, plaintiffs must also "plead and prove intentional discrimination in public accommodations in violation of the terms of the Act." *Rodriguez*, 10 F. Supp. 3d at 1074 (citation omitted).

### i. Elevator

Plaintiffs allege that defendants failed to maintain the elevator in violation of sections 1106A.1, 1102A.2, and 1124A.124 of part 2 of title 24 of the California Code of Regulations, thereby violating the DPA and the Unruh Act. MSJ 25; Cal. Code Regs. tit. 24, part 2, §§ 1106A.1, 1102A.2, 1124A.1. Specifically, plaintiffs point to a portion of section 1106A.1 providing that "[t]he elevator in [an elevator multifamily dwelling] building must provide accessibility to all dwelling units in the building" to support their contention that defendants' alleged failure to maintain the elevator is a violation of that section. *Id.* § 1106A.1. However, the full text of section 1106A.1 provides context informing the interpretation of the provision. *Id.*

---

[10] "Public accommodations constructed or altered after July 1, 1970, are subject to California Health & Safety Code and Government Code requirements for disabled access." *Rodriguez*, 10F. Supp. 3d at 1074. It is undisputed that the Renaissance was constructed for first occupancy in 2017, *see* Doc. 36-1 ¶ 3, and therefore, the California Building Code applies to it.

The section deals with the *design and construction* of buildings, requiring that they are *designed and built* to be accessible to people with disabilities. *Id.* In context, the section cannot reasonably be read to create a requirement regarding maintenance of accessible features. *Id.*

Plaintiffs also contend that defendants violated sections 1102A.2 and 1124A.1. *Id.* §§ 1102A.2, 1124A.1. Section 1102A.2 provides that "[c]overed multifamily dwellings shall be maintained in compliance with the accessibility standards in effect at the time of construction." *Id.* § 1102A.2. Plaintiffs argue that defendants failed to maintain its elevators in compliance with section 1102A.2 by violating section 1124A.1. Section 1124A.1 provides that "[e]levators provided in covered multifamily buildings shall be accessible" and that "[e]levators required to be accessible shall comply with this chapter, ASME A17.1 (Safety Code for Elevators and Escalators), Title 8 of the California Code of Regulations, under 'Elevator Safety Orders,' and any other applicable safety regulations of other administrative authorities having jurisdiction."[11] *Id.* § 1124A.1. Plaintiffs argue that defendants violated section 1124A.1 by violating the following ASME Safety Standards: ASME A17.1 § 8.6.10.4; § 8.6.1.4.1(c); and ASME 17.1 § 8.6.1.2.1.

ASME A17.1 § 8.6.10.4 requires that "a written emergency evacuation procedure shall be made and kept on the premises." Green Decl., Doc. 29-6, Ex. E-2 at 2. Defendants acknowledged at the hearing that they did not have a written emergency evacuation procedure. However, it is unclear how lacking a written emergency evacuation procedure is related to plaintiffs' claims regarding the elevator not providing them adequate access to or from their apartments.[12] Thus, summary judgment is not warranted as to this claim based on a violation of ASME A17.1 § 8.6.10.4.

---

[11] ASME is an acronym for the American Society of Mechanical Engineers. *See generally About ASME*, Am. Soc'y of Mech. Eng'rs, https://www.asme.org/about-asme (last visited Mar. 2, 2025). ASME publishes safety codes and standards. *Id.*

[12] Plaintiffs' expert opined that "[d]efendants' failure to comply with the standards of ASME A17.1, *specifically [s]ection 8.6.1.2.1*, likely contributed to the constant entrapments." Green Decl. ¶ 23 (emphasis added).

15

ASME A17.1 § 8.6.1.4.1(c) requires maintenance records to include the following: "description of dates and call backs (trouble calls) or reports that are reported to elevator personnel by any means, including corrective action taken." Green Decl., Doc. 29-5, Ex. E-1 at 3. Plaintiffs claim that, in violation of this provision, defendants did not document elevator outages if no one was entrapped, and that defendants did not document entrapments that took place during working hours. MSJ 10 (citing Doc. 28 ¶ 24). As to plaintiffs' first claim, the cited evidence does not address outages in which no one was entrapped. As for the second claim, Colbert testified that if an entrapment happened during office hours, he would have created an incident report. Doc. 46-1, Ex. 10, at 148:5-149:1. The cited evidence merely states that Colbert would not record an entrapment that happened during normal working hours *on his employee timecard*, as he did with entrapments that occurred after normal working hours.[13] Doc. 30-28 at 122:16-19 (emphasis added).

Plaintiffs also argue that defendants violated this provision because Colbert would reset the elevator when it malfunctioned, thereby erasing the elevator's internal record of what had gone wrong. MSJ 26; Doc. 30-28 at 89:19-90:16; Green Decl. ¶ 9. Though Green opined in his declaration that defendants violated this section because "Colbert was resetting the elevator and not recording all of [the malfunctions] or completing corrective action," plaintiffs have not carried their burden of production regarding their allegation that defendants did not record all outages and there is a material dispute of fact as to whether defendants documented all entrapments. Additionally, plaintiffs provide no basis for this Court to conclude that erasing *the elevator's* internal record alone would violate § 8.6.1.4.1(c)'s requirement that defendants keep maintenance records with a "description of dates and call backs (trouble calls) or reports that are reported to elevator personnel by any means, including corrective action taken." For these reasons, summary judgment regarding whether defendants violated A17.1 § 8.6.1.4.1(c) is not warranted.

---

[13] Colbert explained elsewhere in his testimony that when he inputs his time outside of his normal working hours, he must list a justification for clocking in to work outside of working hours, and thus, when he would respond to an elevator entrapment after hours, he would therefore list the entrapment as the reason. *See* Doc. 30-28 at 122:5-8.

Finally, ASME 17.1 § 8.6.1.2.1 requires a "maintenance control program" that includes "examinations, maintenance, and tests of equipment at scheduled intervals." Green Decl., Doc. 29-5, Ex. E-1 at 2. Plaintiffs assert that defendants did not ensure regular inspections or maintenance with Schindler, in violation of this provision. MSJ 26; Green Decl., Doc. 44, Ex. B, at 2-16. Pages 2 through 16 of Exhibit B to the Green declaration is a contract between the Renaissance and Schindler, dated "approved" March 15, 2019, which contemplates "preventative maintenance" performed "in accordance with a maintenance schedule specific to [the Renaissance's] equipment" but does not indicate what that schedule would be. Green Decl., Doc. 44, Ex. B, at 2-16. Plaintiffs' expert opined that defendants should have ensured a minimum of monthly preventative visits but, based on his review of "[t]he Schindler records" (Doc. 36-5 at 36-148; Green Decl., Doc. 44, Ex. B at 43-155), believed that only 6 preventative visits occurred in 2019, 10 in 2020, 5 in 2021, 8 in 2022 and 5 in 2023. Green Decl. ¶ 7. Plaintiffs note that many of these visits happened within in the same month. Reply 16 (indicating specific dates).

In response to plaintiffs' assertion that defendants did not have maintenance at scheduled intervals, defendants cite to a contract between the parties dated February 1, 2020, which states that preventative maintenance "shall be provided on the dates and times determined by the [Renaissance]." Doc 36-3 at 27-28. Appendix 2 to the February 1, 2020 contract appears to show that maintenance was scheduled to be performed monthly. Doc. 36-3 at 76. Colbert also testified that the Renaissance pays for monthly preventative maintenance and Schindler performs preventative maintenance monthly. Doc. 46-1, Ex. 17, at 82:9-16. Defendants also dispute the accuracy of the number of preventative visits plaintiffs assert occurred; indeed, a review of the Schindler records reveals 7 work reports marked "preventative maintenance" bearing separates dates in 2019, 10 in 2020, 10 in 2021, 13 in 2022, and 9 in 2023. Doc. 36-5 at 36-148; Green Decl., Doc. 44, Ex. B at 43-155. Thus, there are genuine disputes of material fact regarding whether defendants violated ASME 17.1 § 8.6.1.2.1's requirement that the elevator be maintained at "scheduled intervals," and plaintiffs are not entitled to summary judgment on this claim.

Moreover, there is a material dispute of fact as to whether any alleged violation of ASME 17.1 § 8.6.1.2.1 is sufficiently related to the accessibility difficulties plaintiffs faced. Though

Green opined that "[d]efendants' failure to comply with . . . [s]ection 8.6.1.2.1, likely contributed to the constant entrapments," Green Decl. ¶ 23, Colbert testified that Schindler told him that the elevator issues had to do with "transients" coming into the elevator and "smoking" or "doing something" to cause the elevator to malfunction, indicating to him that there was not an issue with the elevator that could be fixed, by Schindler or by anyone. Doc. 46-1 at 143:1-144:4. Moreover, given the number of preventative maintenance visits that *did* occur without permanent correction of the elevator issues (*see* Doc. 36-5 at 36-148; Green Decl., Doc. 44, Ex. B at 43-155), a reasonable jury could find that the reason for the accessibility issues with the elevator that plaintiffs faced were not related to defendants' alleged failure to schedule more preventative maintenance visits. Thus, for this additional reason, summary judgment on this claim is not warranted.

Given that plaintiffs are not entitled to summary judgment as to any alleged violation of any ASME standard, they are not entitled to summary judgment on their DPA or Unruh Act claims for violation of the California Building Code.

### ii. Dog Park[14]

Similarly, plaintiffs argue that defendants failed to construct its dog park in violation of sections 1127A.1 and 1110A.1 of part 2 of title 24 of the California Code of Regulations, thereby violating the DPA and the Unruh Act. Cal. Code Regs., tit. 24, part 2, §§ 1127A.1, 1110A.1. Section 1127A.1 provides that "common use areas and facilities in covered multifamily housing developments shall be accessible to persons with disabilities. Common use facilities include, but are not limited to, lobbies, toilet and bathing facilities, laundry facilities, community rooms, clubhouses, health and fitness facilities, game rooms and portions of common use tenant storage. All entrances, doors, fixtures and controls shall be on an accessible route." *Id.* § 1127A.1. Section 1110A.1 provides that "[e]xterior accessible routes shall be provided as follows: . . . [a]t

---

[14] In their reply, plaintiffs assert that "Plaintiff Reed still resides at the Property and hence still has standing to bring this claim," and that this claim is not moot given that the park could be reopened. Reply 18. Though defendants stated at the hearing that the dog park has been permanently removed, mooting this claim, defendants have not produced evidence supporting this assertion.

1 least one accessible route shall connect accessible buildings, facilities, elements and spaces that
2 are on the same site;" "[a]t least one accessible route shall connect accessible building or facility
3 entrances with all accessible spaces, elements and covered multifamily dwelling units;" and "[a]n
4 accessible route shall connect at least one accessible entrance of each covered multifamily
5 dwelling unit with exterior spaces and facilities that serve the dwelling unit." *Id.* § 1110A.1.
6 "Walking [and floor and ground] surfaces [on accessible routes] shall be stable, firm and slip
7 resistant." *Id.* §§ 1110A.3, 1113A.1.

There are genuine disputes of material fact as to the condition of the path and whether defendants violated these provisions of the California Building Code, and thereby violated the DPA or the Unruh Act. For example, plaintiffs assert that the path to the dog park is made of compacted sand and grass and that "defendants concede that when it rains the path gets muddy." Reply 18 (citing PSUF ¶ 77).[15] However, Colbert testified that he would not say that the path gets muddy when it rains but rather that it becomes more densely packed and harder. Doc. 46-1 at 62:16-63:1. Summary judgment as to this claim is also not warranted.

## V.   CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment is DENIED.

IT IS SO ORDERED.

Dated:   March 21, 2025

UNITED STATES DISTRICT JUDGE

---

[15] PSUF ¶ 77 purports to cite to Colbert's testimony for the proposition that defendants concede the path gets muddy when it rains. However, plaintiffs have not included in the record any such portion of Colbert's testimony. At the hearing, plaintiffs alleged instead that defendants made this concession in response to an unspecified request for admission. Plaintiffs do not cite to any such response in their pleadings and they have failed to meet their burden of establishing there is no genuine dispute of material fact.

19